[Nos. A079881 and A080466. First Dist., Div. Three. May 19, 1999.]

THE RECORDER, Plaintiff and Respondent, v.
COMMISSION ON JUDICIAL PERFORMANCE, Defendant and
Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

## COUNSEL

Stephen R. Barnett; Levy, Ram & Olson and Karl Olson for Plaintiff and Respondent The Recorder.

Lewis, D'Amato, Brisbois & Bisgaard and James E. Friedhofer for National Union Fire Insurance Company of Pittsburgh, PA and A.I. Management and Professional Liability Claims Adjusters as Amici Curiae on behalf of Plaintiff and Respondent.

Ephraim Margolin as Amicus Curiae on behalf of Plaintiff and Respondent.

Floger, Levin & Kan, Samuel R. Miller, Kelvin T. Wyles; Richard G. R. Schickele; Jack Coyle; and Roland W. Selman for Defendant and Appellant.

## OPINION

PHELAN, J.[*]—These consolidated appeals present important questions of first impression about an initiative measure, commonly known as Proposition 190, which was approved by a large majority of California voters in 1994. The Commission on Judicial Performance (the commission) timely appeals from an order granting a petition for writ of mandate filed in June 1997 by The Recorder, a legal newspaper published in San Francisco, in an effort to compel the commission to disclose how individual commissioners voted in formal disciplinary proceedings concerning the Honorable Jose Angel Velasquez of the Municipal Court of Monterey County, and in all subsequent formal proceedings regarding judicial discipline. The Recorder contends that such disclosure is required by California Constitution, article VI, section 18, subdivision (j), a provision enacted as part of Proposition 190.

The commission claims it acted within its rulemaking authority as conferred by California Constitution, article VI, section 18, subdivision (i)[1]— which was also enacted as part of Proposition 190—by adopting procedures allowing it to withhold information about how individual commission members voted with respect to imposition of judicial discipline following "formal proceedings," despite the fact that pursuant to section 18(j) all such proceedings must now be "open to the public." (*Ibid.*) In fact, the commission has

---

[*]Retired Presiding Justice of the Court of Appeal, First District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All further constitutional references are to article VI of the California Constitution. In addition, for convenience we will hereinafter refer to sections 8 and 18 of article VI in shortened form. For example, the current versions of section 18, subdivisions (i) and (j) will be cited as, respectively, "section 18(i)" and "section 18(j)."

not adopted any specific rule affirmatively authorizing it to withhold this information from the public. Rather, the commission asserts that, even after passage of Proposition 190, it can simply continue its "longstanding historical practice" of revealing only the total vote count.

We conclude the vote of the members on whether or not to impose judicial discipline is such an essential and integral part of the formal proceedings of the commission—perhaps the single most important act a member takes in his or her capacity as such—that it would be plainly unreasonable to accept the commission's interpretation of its authority under section 18(i) and 18(j). That is, when California voters overwhelmingly approved a requirement that all "proceedings" subsequent to the filing of formal disciplinary charges "shall be open to the public" (§ 18(j)), they must have intended the commission to vote in public or at least to disclose the full results of its vote, including how each commission member voted. We further conclude, however, that—like an intermediate appellate court, or an administrative agency acting in an adjudicative capacity—the commission is not required to conduct its "deliberations" in public. Section 18(j) was clearly not intended as an "open meeting" law but, rather, as a provision relating to adjudicatory proceedings, as to which it is well settled and universally recognized that the judicial "thought process" need not be publicly revealed.

Accordingly, in the published portion of this opinion, we affirm the order directing the commission to disclose the full results of the vote on discipline in Judge Velasquez's case and in all subsequent formal proceedings regarding judicial discipline under section 18(j). In the unpublished portion of the opinion, we consider and reject the commission's argument that the trial court abused its discretion by awarding The Recorder its attorney fees pursuant to Code of Civil Procedure section 1021.5 (hereinafter, section 1021.5). Thus, the order granting The Recorder's request for attorney fees is also affirmed.

## I.  Background

### A.  *The Enactment of Proposition 190 and Implementing Rules.*

Proposition 190 was derived from Assembly Constitutional Amendment No. 46, and placed on the November 8, 1994, ballot by the Legislature. (Assem. Const. Amend. No. 46 (1994-1995 Reg. Sess.) res. ch. 111.) The voters of California approved Proposition 190 at the November 1994 election, and thereby substantially amended sections 8 and 18 of article VI of the California Constitution. By its terms, Proposition 190 became operative on March 1, 1995. (§ 18(j); and see *Dodds* v. *Commission on Judicial Performance* (1995) 12 Cal.4th 163, 168, fn. 1 [48 Cal.Rptr.2d 106, 906 P.2d 1260].)

Proposition 190 effected several significant changes in the system for imposing judicial discipline in California. It increased the total membership of the commission from nine to eleven, and the number of public members from two to six, so that the public members would constitute a majority. (§ 8(a).)[2] It vested the commission with ultimate authority to make censure and removal determinations, subject to discretionary review by the Supreme Court. (§ 18(d).) It created absolute immunity for commission members and staff "from suit for all conduct at any time in the course of their official duties." (§ 18(h).) Most importantly for our purposes, Proposition 190 shifted authority to make rules "for the investigation of judges" and "for formal proceedings" from the Judicial Council to the commission itself (§ 18(i)),[3] and required that "the notice of charges, the answer, and *all subsequent papers and proceedings shall be open to the public* for all formal proceedings instituted after February 28, 1995." (§ 18(j), italics added.)[4]

After Proposition 190 took effect, the commission undertook a review of its rules and procedures. Proposed rules were circulated for public comment early in 1996, and revised rules were adopted effective December 1, 1996. In the course of this rulemaking proceeding, one of The Recorder's attorneys, Stephen R. Barnett, submitted a letter urging the commission to amend its rules to provide that "in the case of any official action by the [c]ommission, the votes of the individual [c]ommission members shall be made public." This comment was considered by the commission, but rejected, as follows: "One comment was received suggesting that the votes of the individual commission members should be made public. After consideration, the commission determined not to make this suggested modification, noting that

---

[2]Since the effective date of Proposition 190, section 8(a) has provided in relevant part: "The Commission on Judicial Performance consists of one judge of a court of appeal, one judge of a superior court, and one judge of a municipal court, each appointed by the Supreme Court; 2 members of the State Bar of California who have practiced law in this State for 10 years, each appointed by the Governor; and 6 citizens who are not judges, retired judges, or members of the State Bar of California, 2 of whom shall be appointed by the Governor, 2 by the Senate Committee on Rules, and 2 by the Speaker of the Assembly." Prior to the effective date of Proposition 190, former section 8(a) provided for a commission membership of nine, including two judges of the Courts of Appeal, two judges of the superior courts, and one judge of the municipal court, plus two members of the State Bar of California and two citizen members. (Former § 8(a), as amended by Prop. 92, approved Nov. 8, 1988.)

[3]Section 18(i) provides in full: "The Commission on Judicial Performance shall make rules implementing this section, including, but not limited to, the following: [¶] (1) The commission shall make rules for the investigation of judges. The commission may provide for the confidentiality of complaints to and investigations by the commission. [¶] (2) The commission shall make *rules for formal proceedings against judges* when there is cause to believe there is a disability or wrongdoing within the meaning of subdivision (d)." (Italics added.)

[4]Section 18(j) provides in full: "When the commission institutes formal proceedings, the notice of charges, the answer, and all subsequent papers and proceedings shall be open to the public for all formal proceedings instituted after February 28, 1995."

disclosure does not appear to be required by Proposition 190 or any other provision of law. It is the commission's *policy* to release only the tally of total votes in favor of and against public discipline decisions in order to foster determinations unaffected by concerns extraneous to the impartial consideration of matters before the commission." (Italics added.)

B.  *The Recorder's Prelitigation Requests for the Commission's Voting Records.*

Asserting a belief that Proposition 190 assured to the general public a right to know how individual commission members cast their votes in formal proceedings for judicial discipline, The Recorder wrote to the commission on September 5, 1996, asking for this information in each post-Proposition-190 case. The Recorder also took its case to its readership with an editorial entitled "Judicial Panel's Votes Should Be Public."

The commission refused to comply with these requests and, in a letter to The Recorder dated September 18, 1996, then Vice-Chair Robert C. Bonner explained its refusal as follows: "Proposition 190 did significantly open up the proceedings of the Commission on Judicial Performance through a series of broad, yet very specific changes. Nothing in Proposition 190, however, requires that the votes of individual members be made public, and individual commissioner's votes have never been made public during the commission's history. Because Proposition 190 vested in the commission the authority to promulgate its procedural rules, the issue of what voting information should be released was necessarily left to the commission. [¶] Important policy considerations weigh in favor of disclosing the total votes in support of and against commission action, but against disclosing the way each individual commissioner voted. Releasing only the total number of votes in favor and in opposition to the commission decision is intended to safeguard the independent voting of the commissioners. As distinct from the judiciary, the members of the commission do not serve full-time in their adjudicatory function. As the editorial recognizes, judges no longer comprise the majority of the commission's members. Today, the majority are public members and attorneys who may be appearing before the judges under the commission's jurisdiction. Disclosing how individual commissioners voted might well diminish the independence and objectivity so important to the commission's decision-making."

In a letter dated, October 1, 1996, the commission's director and chief counsel, Victoria B. Henley, added: "[T]he breakdown of commission votes according to individual members has never been made public and the commission has determined to continue making public only the total number

of votes in support of and against commission action. Moreover, since the tally of votes for and against is the only information which has been made public historically, records have not been maintained by the commission of each member's individual voting."

Judge Velasquez was publicly censured following formal proceedings instituted in August 1996. At the conclusion of those proceedings, the commission issued a decision and order, dated April 16, 1997, which announced its vote as "8 to 2, with one [c]ommissioner abstaining." On April 30, 1997, The Recorder again wrote to the commission, requesting disclosure of the commissioners' votes in that proceeding. The Recorder's letter was signed by its counsel and stated that The Recorder was authorized to take legal action if the requested information was not provided.

After thus receiving notice of the instant lawsuit, the commission issued an order dated May 28, 1997, reporting a modified vote count of "7 to 2, with one [c]ommissioner recused."[5] The commission offered no explanation for the change in the vote tally and, in a letter signed by Mr. Bonner and dated June 2, 1997, reiterated its refusal to disclose how individual commission members voted. In the same letter, the commission asserted that it "does not vote by written ballots, secret or otherwise, nor does it maintain any other records identifying how individual members voted." However, Mr. Bonner did not explain how the commission was otherwise able to uncover the error in the vote count (and abstention) disclosed in the April 16 decision and order, or how it confirmed the correctness of the vote count (and recusal) disclosed over a month later on May 29.

### C. *The Instant Litigation.*

On June 5, 1997, The Recorder filed a petition for writ of mandate in San Francisco Superior Court. Citing section 18(g),[6] the commission raised a jurisdictional objection to the mandate proceeding in superior court, contending that only the California Supreme Court has jurisdiction over it. The

---

[5]The Recorder suggests this is evidence that the commission must have some physical recording of its votes, which would constitute "papers" within the meaning of section 18(j), that must be "open to the public." (*Ibid.*) The commission has denied it maintains any "written ballots" or "any other records identifying how individual members voted" but, as we have noted, has not explained how it was nevertheless able to correct the error in the vote tally in the Velasquez matter or, more generally, how it could confirm the accuracy of any given vote if asked to do so. In any event, we need not reach this issue because, as we will discuss, the vote of each commission member is such an integral part of the "proceedings" for judicial discipline as to be subject to mandatory public disclosure whether or not it is reduced to writing or recorded in the commission's "papers."

[6]In relevant part, section 18(g) provides: "No court, except the Supreme Court, shall have jurisdiction in a civil action or other legal proceeding of any sort brought against the commission by a judge."

trial court reserved decision on the issue of jurisdiction and issued an alternative writ setting a hearing for June 26, 1997. On July 10, 1997, after considering the parties' briefs and arguments, the language of Proposition 190 and evidence of the voters' intent, the trial court issued an order requiring the commission "to reveal how individual commissioners voted" in the Velasquez matter and "in all subsequent formal decisions."[7] The commission timely appealed from this order on July 17, 1997, in No. A079881.

On August 19, 1997, The Recorder filed a motion seeking attorney fees pursuant to section 1021.5. The commission vigorously opposed the motion. After a hearing on September 5, 1997, the trial court granted The Recorder's motion in full, applying a multiplier of 1.25 and awarding "fees on fees" for preparation of the motion, for a total award of $49,207.20. The trial court's order recited that it was granting The Recorder's fee request for "all the reasons stated in the Recorder's motion." The commission timely appealed from this order on September 30, 1997, in No. A080466.

## II. DISCUSSION—APPEAL No. A079881

In No. A079881, the parties' dispute centers on the commission's interpretation of its rulemaking authority under section 18(i), and its interpretation of section 18(j) insofar as it mandates that all "proceedings" subsequent to the filing of formal charges "shall be open to the public." The commission contends, and The Recorder does not dispute, that all the issues presented in this appeal are pure questions of law, subject to de novo review by this court. (*Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

### A. *The Superior Court Had Jurisdiction to Adjudicate The Recorder's Petition for Writ of Mandate.*

■ Before turning to the merits of this appeal, we must address the commission's claim, based on sections 18(g) and 18(h), that the superior court lacks subject matter jurisdiction to issue a writ of mandate against it or its members or otherwise to review any determination it makes regarding judicial discipline.

Obviously sections 18(g) and 18(h) do not, by their express terms, support the commission's argument. Those provisions make it clear that our Supreme Court has exclusive jurisdiction over any "legal proceeding of any

[7]The issue whether the commission's "deliberations" must be conducted in public was vigorously debated in the hearings before the trial court, but the Recorder did not (and does not) specifically seek to compel the commission to make any disclosure regarding the deliberations in either the Velasquez case or in any subsequent disciplinary proceedings.

sort *brought against the commission by a judge,*" and that commissioners cannot be sued for any act undertaken in the course of their official duties. (Italics added.) Sections 18(g) and 18(h) do not—expressly or otherwise—purport to limit the broad authority of the superior court, as conferred by article VI, section 10 of the California Constitution and Code of Civil Procedure section 1085 to hear and decide petitions for writ of mandamus.[8]

The commission offers no cogent interpretation of the language used in section 18(g), and cites no ballot language or other historical data suggesting that the voters intended to insulate it from suit of any type in any judicial forum, save for actions by individual judges in the Supreme Court.[9] Indeed, the commission admits that section 18(g) does not "specifically address the issue of jurisdiction in writ proceedings brought against the commission by persons other than a judge." (Emphasis in original.)

Without recognizing even a hint of irony, the commission nevertheless contends that section 18(g) was designed to avoid the problem that arose in cases such as *Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th 163, and *Adams* v. *Commission on Judicial Performance* (1995) 10 Cal.4th 866 [42 Cal.Rptr.2d 606, 897 P.2d 544], where individual judges brought proceedings in superior court seeking to block the commission from conducting *open* hearings. Vesting exclusive jurisdiction in the Supreme Court, the commission claims, was intended to prevent such ancillary actions from delaying or interfering with disciplinary proceedings. However, there is no indication that the instant writ proceeding did, or could, delay or interfere with the Velasquez matter or with any other case pending before the commission.[10]

The commission further contends that third parties should have no greater access to a judicial forum to litigate with the commission than do the judges

[8]We are in no way bound to accept the commission's interpretation of Code of Civil Procedure section 1085, pursuant to which it claims it is "evident" that it is not an "inferior tribunal, corporation, board, or person" subject to the broad jurisdiction of the superior court in writ proceedings. Nor does the fact the Legislature has seen fit to enact certain explicit statutory limits on the jurisdiction of the superior court to issue writs as against certain state administrative agencies (see Lab. Code, § 5955 [Workers' Compensation Appeals Board]; Pub. Util. Code, § 1759 [Public Utilities Commission]; Bus. & Prof. Code, § 23090.5 [Department of Alcoholic Beverage Control]) mean that we should *imply* such a limitation as to the commission.

[9]Since The Recorder did not name, serve, or otherwise join any individual member of the commission, either in their official or individual capacities, we refrain from further comment on the meaning and effect of section 18(h).

[10]The commission posits various scenarios under which a judge as to whom the commission has commenced formal proceedings might enlist the aid of a third party to bring a writ proceeding to challenge some aspect of commission procedure. We need not address this issue because there is no indication in this case that The Recorder is acting at the behest or for the benefit of any individual judge.

who are subject to discipline before that body. This is, however, just another way of saying that the voters intended to insulate the commission and its members from any lawsuit of any type in any judicial forum, except for actions by individual judges in the Supreme Court. As we have noted, the commission cites no statutory language or case law to support this sweeping claim of immunity, and we have found none in our research. Accordingly, we reject the commission's jurisdictional objections.

B. *The Vote of the Commission Regarding Imposition of Judicial Discipline Is a Critical Stage of the "Formal Proceedings" Which Must Be "Open to the Public" Pursuant to Section 18(j).*

The central issue presented in this appeal involves the commission's interpretation of sections 18(i) and 18(j). The commission claims it has fully complied with the mandate of section 18(j) by conducting all formal "proceedings" in open session, under rules it duly adopted after the passage of Proposition 190 regarding "Confidentiality and Disclosure." (Rules Com. Jud. Performance, rule 102.)[11] Specifically, during its rulemaking and before this court, the commission has interpreted the word "proceedings" in section 18(j) to mean "any proceeding which the affected judge and his or her counsel could attend," including "all evidentiary hearings before the [c]ommission or special masters and any oral arguments before the [c]ommission itself," but not "the [c]ommission's deliberations or voting." For reasons we shall explain, we reject this interpretation.

The rules governing interpretation of constitutional amendments are well established: "Constitutional provisions must be construed to give full force and effect to every portion thereof. It is the legal intendment that each and every clause has been inserted for a useful purpose and when rightly understood has some practical operation. [Citations.] Furthermore, a constitutional amendment should be construed in accordance with the natural and ordinary meaning of the words as generally understood at the time of its enactment. [Citations.] Accordingly, where it does not appear that words used in a constitutional amendment were used in a technical sense, the voters must be deemed to have construed the amendment by the meaning apparent

---

[11]In relevant part, rule 102 of the Rules of Commission on Judicial Performance provides: "(a) (**Scope of Rule**) Except as provided in this rule, all papers filed with and proceedings before the commission shall be confidential. . . . [¶] (b) (**Disclosure after institution of formal proceedings**) When the commission institutes formal proceedings, the following shall not be confidential: [¶] (1) The notice of formal proceedings and all subsequent papers filed with the commission and the special masters, all stipulations entered, all findings of fact and conclusions of law made by the special masters and by the commission, and all disciplinary determinations made by the commission; [and] [¶] (2) The formal hearing before the special masters and the appearance before the commission." (Boldface in original.)

on its face according to the general use of the words employed. [Citations.] . . . In the absence of definition of words in the Constitution, words having no technical meaning will be taken in their ordinary and generally accepted sense. [Citation.]" (*In re Quinn* (1973) 35 Cal.App.3d 473, 482-483 [110 Cal.Rptr. 881]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281]; see also *People* ex rel. *Lungren* v. *Superior Court* (1996) 14 Cal.4th 294, 301, 305 [58 Cal.Rptr.2d 855, 926 P.2d 1042] [parallel rules of construction for initiatives approving new statutory provisions].)

■ "Where a provision in the Constitution is ambiguous, a court must ordinarily adopt that interpretation which carries out the intent and objective of the drafters of the provision and the people by whose vote it was adopted. [Citations.]" (*Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 495 [159 Cal.Rptr. 494, 601 P.2d 1030]; see also *White* v. *Davis* (1975) 13 Cal.3d 757, 775 & fn. 11 [120 Cal.Rptr. 94, 533 P.2d 222].) "The argument submitted to the electors in support of a proposed constitutional amendment is not controlling but may be resorted to as an aid in determining the intention of the framers and the electorate. [Citations.] [¶] New provisions of the Constitution must be considered with reference to the situation intended to be remedied or provided for. [Citations.]" (*In re Quinn, supra,* 35 Cal.App.3d at p. 483; *Mosk* v. *Superior Court, supra,* at p. 495 ["To ascertain the intent and objective of an ambiguous constitutional provision, a court may consider . . . written arguments in voter pamphlets."]; see also *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245-246 ["[W]hen . . . the enactment follows voter approval, the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language."].)

■ In addition, "As a general rule, past or contemporaneous interpretation by an administrative entity of its constitutional authority, and of a constitutional provision it is charged with implementing, is accorded considerable weight [citation], and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized. [Citations.]" (*Adams* v. *Commission on Judicial Performance* (1994) 8 Cal.4th 630, 657-658 [34 Cal.Rptr.2d 641, 882 P.2d 358].) Past or contemporaneous agency interpretation can be particularly useful to resolve "apparent ambiguities" in a new enactment. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 245.)

1. *Section 18(j) Is Ambiguous.*

Maneuvering for an advantageous position on the battlefield of constitutional interpretation, the commission and The Recorder both contend, at least

initially, that section 18(j) is unambiguous and that the "plain language" used in that provision favors their respective—but diametrically opposed—positions on the issue whether the votes of individual commission members must be disclosed to the public. That is, The Recorder contends that the term "papers" or the term "proceedings," or both, clearly encompass the casting and recording of votes by individual commissioners. For its "plain language" argument, the commission relies primarily on what is *not* found in section 18(j), i.e., on the *absence* of any specific provision requiring disclosure of the votes of individual commissioners. However, the commission also appears to contend that the "formal hearing before the special masters and the appearance before the commission" are its only "proceedings," and that those are the only activities it must conduct in public. (See Rules Com. Jud. Performance, rule 102(b).)

In its reply brief, the commission ultimately comes around to conceding that there is at least a "latent ambiguity" in the term "proceedings." This concession is appropriate. (See *Mosk v. Superior Court, supra,* 25 Cal.3d at p. 495 [The conflicting contentions of the parties regarding meaning of former section 18(f) point to a latent ambiguity in that provision].) As the *Mosk* court explained: " '[A] latent ambiguity is said to exist where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic evidence creates a *necessity* for interpretation or a choice among two or more *possible meanings.*' " (25 Cal.3d at p. 495, fn. 18, italics in original, quoting Note, *Constitutional Law: The Doctrine of Latent Ambiguities as Applied to the California Constitution* (1943) 31 Cal.L.Rev. 203, 205.)

Indeed, the Legislature could hardly have chosen a more malleable term. "The word 'proceeding' necessarily has different meanings, according to the context and the subject to which it relates. . . . In section 473 of the Code of Civil Procedure, and in similar statutory provisions of other states, it has a broader signification, and includes any step taken in a case, whether by the court or by one of the parties thereto. [Citations.] 'In its more general sense, in law, it means *all the steps or measures adopted in the prosecution or defense of an action.*' [Citations.]" (*Burns v. Superior Court* (1903) 140 Cal. 1, 5-6 [73 P. 597], italics added; and see *id.* at p. 9 [the term "proceedings" includes the issuance of a subpoena by a notary at the request of one party seeking to depose another, and the taking of a deposition]; see also *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 43 [210 Cal.Rptr. 762, 694 P.2d 1134] (conc. opn. of Bird, C. J.); *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1105 [1 Cal.Rptr.2d 222]; *Lister v. Superior Court* (1979) 98 Cal.App.3d 64, 70 [159 Cal.Rptr. 280].)

Given the inherent ambiguity of the term "proceedings," we must look beyond the plain language of section 18(j) to ascertain its meaning and

scope in the present context. In particular, we must look to external sources to determine whether the drafters and the voters intended the term "proceedings" to encompass the "step" or stage of the process in which individual commissioners cast their votes and thereby decide whether to impose discipline upon a judge as to whom formal proceedings have been commenced. If so, it necessarily follows that that step of the proceedings must be "open to the public." We turn now to an examination of extrinsic "evidence" bearing on this issue.

### 2. *Interpreting Section 18(j) to Mandate Disclosure of the Votes of Individual Commission Members Effectuates the Intent and Objectives of the Drafters of Proposition 190 and the Voters Who Approved It.*

The commission offers a very simple, straightforward solution to the problem of ambiguity presented by the term "proceedings": that we should simply defer to its interpretation of section 18(j). The commission is, of course, correct that we must give "considerable weight" to its "past or contemporaneous interpretation . . . of its constitutional authority, and of a constitutional provision it is charged with implementing." (*Adams v. Commission on Judicial Performance, supra,* 8 Cal.4th at pp. 657-658.) We may also look to the commission's interpretation to help resolve "apparent ambiguities" in the new enactment. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 245.) However, we must also examine "evidence" of the intent of the drafters and the voters who approved Proposition 190, including the ballot arguments prepared for the November 1994 elections. (*Mosk* v. *Superior Court, supra,* 25 Cal.3d at p. 495; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245-246; *In re Quinn, supra,* 35 Cal.App.3d at p. 483; see also *Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 260 [5 Cal.Rptr.2d 545, 825 P.2d 438] ["The first step in interpreting an ambiguous constitutional provision is to look at the intent of the framers."]; *White* v. *Davis, supra,* 13 Cal.3d 757, 775 [the ballot arguments are the only available " 'legislative history' " for a constitutional amendment enacted by initiative].) After carefully considering these ballot materials and the commission's arguments about the proper construction of section 18(j), we respectfully decline to accept the commission's interpretation because we believe it is clearly erroneous, and because it is at odds with the express intent and objectives of the drafters of Proposition 190 and the voters who approved the constitutional amendments contained therein.

There are several problems with the commission's interpretation. It is, above all, far too grudging. In essence, the commission appears to treat the terms "proceedings" and "hearings" as interchangeable. California courts

have long recognized that the term "proceedings" is broader than the term "hearings." (*Forrest* v. *Trustees of Cal. State University & Colleges* (1984) 160 Cal.App.3d 357, 367 [206 Cal.Rptr. 595]; *Gipe* v. *Superior Court* (1981) 124 Cal.App.3d 617, 625-626 [177 Cal.Rptr. 590], citing *Burns* v. *Superior Court, supra,* 140 Cal. at p. 6.) Indeed, as the *Gipe* court put it, any attempt to equate the two "flies in the face of the ordinary meaning of 'proceedings.' " (124 Cal.App.3d at p. 626.)[12]

The commission's attempt to equate the terms "proceedings" and "hearings" also "flies in the face" of the history of sections 8 and 18. The broad significance of the phrase "all subsequent . . . proceedings" in Proposition 190 and section 18(j) can, perhaps, best be understood by contrasting the new scheme with what it replaced. (See *In re Quinn, supra,* 35 Cal.App.3d at p. 483 [new provisions of the Constitution must be considered with reference to the situation intended to be remedied or provided for]; *Resure, Inc.* v. *Superior Court* (1996) 42 Cal.App.4th 156, 164 [49 Cal.Rptr.2d 354].)

In 1994, in *Adams* v. *Commission on Judicial Performance, supra,* 8 Cal.4th 630, our Supreme Court described the evolution of the system of judicial discipline in California, and in particular the provisions of section 18, as follows: "Prior to the passage, at the November 1988 General Election, of the legislative proposal to amend the constitutional provision, former subdivision (f) of article VI, section 18, provided: 'The Judicial Council shall make rules implementing this section and providing for confidentiality of proceedings.' In *Mosk* v. *Superior Court*[, *supra,*] 25 Cal.3d 474 . . . , the court concluded that this former version of subdivision (f) mandated confidentiality of investigations and proceedings before the Commission, and that, accordingly, the Judicial Council did not have the authority to promulgate rules providing for investigations and hearings open to the public. In reaching this conclusion, the court relied upon the language of former section 10b, paragraph (3), of article VI, as adopted by constitutional amendment in November 1960, which expressly provided for the confidentiality of all proceedings before the Commission, and concluded there was no indication 'that the people of California intended to change the constitutional requirement of confidentiality by revision of article VI in 1966 . . . .' " (25 Cal.3d at p. 499.)

---

[12]By asserting that issuance of a "signed" decision on matters it hears after a formal presentation of evidence is not an activity that must be held "open to the public," the commission even takes a narrow, truncated view of what constitutes a "hearing." As our Supreme Court recently noted, that term, too, is ambiguous and is subject to dispute. (*Lewis* v. *Superior Court* (1999) 19 Cal.4th 1232, 1247-1248 [82 Cal.Rptr.2d 85, 970 P.2d 872].) However, a long-standing definition found in the case law encompasses both the information-gathering and *decisional* aspects of such a proceeding: "A 'hearing' is generally understood to be a proceeding where *evidence is taken* to the end of determining an issue of fact *and a decision made* on the basis of that evidence.' " (*People* v. *Pennington* (1967) 66 Cal.2d 508, 521 [58 Cal.Rptr. 374, 426 P.2d 942], italics added.)

"The constitutional provision interpreted in the *Mosk* decision remained unchanged until the November 1988 election. Prior to that election, the Senate resolved, with the Assembly concurring, to propose to the voters that article VI, sections 8 and 18, of the California Constitution, be amended to provide, inter alia, that, under some circumstances, hearings on judicial performance before the Commission could be opened to public scrutiny. (Sen. Const. Amend. No. 6, Stats. 1988 (1987-1988 Reg. Sess.) res. ch. 67, pp. 6115-6116.) The preamble to the legislative resolution proposing the constitutional amendment states: 'WHEREAS, The Legislature finds and declares that maintaining public confidence in the integrity of the judicial system is essential to good government; and [¶] WHEREAS, The Commission on Judicial Performance bears a great public trust which it must currently fulfill in total secrecy; and [¶] WHEREAS, Because responsible public disclosure and accountability is proper, desirable, and consistent with the goal of public confidence, it is the intent of this measure that appropriate commission proceedings be open to public scrutiny, and that this measure be construed so as to accomplish this purpose which is hereby declared to be the public policy of this state . . . .' (*Id.*, at p. 6115.)

"The constitutional amendment was submitted to the voters as Proposition 92 and was approved, effective November 9, 1988. . . . Section 18, subdivision (f), now provides that if, after conducting a preliminary investigation, the Commission by vote determines that formal proceedings should be instituted against a judge, the Commission 'may in the pursuit of public confidence and the interests of justice, issue press statements or releases or, in the event charges involve moral turpitude, dishonesty, or corruption, *open hearings* to the public.' (Art. VI, § 18, subd. (f)(3).)" (*Adams* v. *Commission on Judicial Performance, supra,* 8 Cal.4th at pp. 646-647, fn. omitted, italics added.)

As the *Adams* court explained, the history of the constitutional provisions governing judicial discipline in California shows a trend toward greater openness and less secrecy, and that evolution continues with Proposition 190. (See *Adams* v. *Commission on Judicial Performance, supra,* 8 Cal.4th at pp. 646-647.) The 1988 and 1994 amendments also reflect the growing desire of the voters of California to limit the discretion of those in charge of the machinery of judicial discipline to determine which aspects of the process may be conducted behind closed doors. Thus, the law prior to passage of Proposition 190 *permitted* open "*hearings*" in certain circumstances, while the language of the 1994 amendments *mandates* that "*all . . . proceedings*" subsequent to the filing of formal charges must be "open to the public." (§ 18(j).) This history suggests that the drafters of Proposition 190 purposefully chose the broader term "proceedings" over "hearings," the term

that was being replaced, and meant to maximize the openness of formal disciplinary proceedings of the commission.[13]

The ballot arguments filed in connection with the November 1994 election support our conclusion on this point. A careful examination of those arguments reveals that the primary purposes of Proposition 190 were to *eliminate* secrecy in the commission's formal disciplinary proceedings and to ensure public accountability of the commission for its disciplinary determinations. The proponents of Proposition 190 could not have been more clear about this, as stated in their ballot argument: "Proposition 190 is an important and timely reform measure. Judges are public servants and play a critical role in our society. The public must have confidence and trust in those holding judicial office. PROPOSITION 190 PLACES JUDICIAL DISCIPLINE IN THE HANDS OF A BROAD PANEL OF PUBLIC CITIZENS, JUDGES AND ATTORNEYS AND OPENS ALL FORMAL PROCEEDINGS TO THE PUBLIC JUST AS OTHER STATES HAVE DONE IN RECENT YEARS. *CALIFORNIA MUST ELIMINATE SECRECY AND ENSURE INTEGRITY IN THE DISCIPLINARY PROCESS.*" (Ballot Pamp., argument in favor of Prop. 190 as presented to the voters, Gen. Elec. (Nov. 8, 1994) p. 12, upper case and italics in original.) The ballot argument in favor of Proposition 190 also stated: "Under Proposition 190, the commission would be required to open *all formal proceedings* against judges to the public. Currently, all hearings and commission documents, including the actual charges against the judge, are secret. WITHOUT KNOWLEDGE OF CHARGES OR PROCEEDINGS, THE PUBLIC CANNOT HAVE CONFIDENCE IN THE JUDICIAL SYSTEM." (*Ibid.*, upper case and italics in original.)

Perhaps the most fundamental problem with the commission's approach is that, by adopting rule 102(b) of the Rules of Commission on Judicial Performance, the commission has, in essence, established a sweeping rule of confidentiality with only a few narrow exceptions for aspects of formal disciplinary proceedings that will be held "open to the public." This is precisely the *opposite* of the regime the Legislature and the voters were

---

[13]Indeed, the formal hearings before the special masters and the commission are not the only "subsequent . . . proceedings" contemplated by section 18 and by the commission's own rules. They are not even the only types of "hearings" the commission is likely to hold. The commission does not explain why it appears to have excluded from the scope of "all subsequent . . . proceedings," all aspects of discovery, the issuance of subpoenas, depositions of witnesses who are unable or cannot be made to appear before the special masters, and any "pre-trial" motions a judge may wish to make, to name a few types of "proceedings" that are not included among the "exceptions" to confidentiality established by rule 102 of the Rules of Commission on Judicial Performance. Obviously, these additional proceedings are not at issue in this case, but we make this point to highlight how narrowly the commission has construed its constitutional mandate for "open" proceedings.

attempting to establish by enacting Proposition 190 and section 18(j).[14] In short, the commission's interpretation cannot be sustained because it cannot be reconciled with the clearly expressed intent to inspire public confidence in the California system of judicial discipline by eliminating the secrecy that shrouded formal disciplinary proceedings in the past.

But the proponents of Proposition 190 did not simply make broad pronouncements of their intent to eliminate secrecy and open judicial disciplinary proceedings to public scrutiny. They also provided some useful guidance as to the procedural model they envisioned for formal judicial discipline by saying: "*Just as we require criminal proceedings and attorney discipline proceedings to be open*, we should also hold judges to the same standard where serious misconduct is at issue." (Ballot Pamp., argument in favor of Prop. 190 as presented to the voters, *supra*, at p. 12, italics added.) That the proponents singled out these two adjudicative systems goes a long way toward persuading us that they, and the voters who approved Proposition 190, intended the commissioners' votes to be "open to the public," at least in the sense of revealing how each individual commissioner voted.[15]

---

[14]Indeed, the instant case presents the flip side of *Mosk* v. *Superior Court, supra,* 25 Cal.3d 474. In that case, the Supreme Court held that in view of a constitutional provision which then required the Judicial Council to make rules providing for the confidentiality of proceedings, the commission had acted outside its authority by promulgating rules under its discretionary rulemaking authority providing for public hearings in some cases. (*Id.* at p. 499.) Here, by contrast, the commission asks us to find that, despite the enactment of a constitutional mandate that "all . . . proceedings" subsequent to the institution of formal disciplinary proceedings must be open to the public, it may, nevertheless, under its discretionary rulemaking authority, provide for confidential proceedings. Thus, to the extent the commission adopted rule 102(b) of the Rules of Commission on Judicial Performance to compel the confidentiality of the commissioners' individual votes, it acted outside its authority. (See *Mosk* v. *Superior Court, supra,* at p. 499.)

[15]As we have noted, the proponents of Proposition 190 also mentioned approvingly the many other states that have "PLACE[D] JUDICIAL DISCIPLINE IN THE HANDS OF A BROAD PANEL OF PUBLIC CITIZENS, JUDGES AND ATTORNEYS AND OPEN[ED] ALL FORMAL PROCEEDINGS TO THE PUBLIC . . . IN RECENT YEARS." (Ballot Pamp., argument in favor of Prop. 190 as presented to the voters, *supra*, at p. 12.) In its brief and appendices, The Recorder has set forth detailed descriptions of the system of judicial discipline in 10 such states—Georgia, Kansas, Nevada, New York, Oregon, Pennsylvania, Tennessee, Utah, Vermont, and Washington—all of which have attorney and public members, and all of which apparently disclose the individual votes of their members, usually by issuing a signed decision. (See, e.g., Ga. Const., art. VI, § VII, ¶ VI; Rules Ga. Jud. Qualifications Com., rule 14; Kan. Supreme Ct. Rules Jud. Conduct, rules 602, 608, 622; Nev. Const., art. 6, § 21, subd. 2; Rules Nev. Com. Jud. Discipline, rule 7; N.Y. Jud. Law, § 44, subd. 7; Or. Rev. Stat. § 1.420, subd. (3); Pa. Const., art. V, § 18, subd. (b); Tenn. Code Ann. §§ 10-7-503, 17-5-201, 17-5-304, subd. (e); Utah Code Ann. § 78-7-27; Rules Utah Jud. Conduct Com. 595-1-10(h); Vt. State Disciplinary Control Rules 4(1), 6(15), 6(20)(b); Wash. Const., art. IV, § 31, subds. (1), (3), (4); Wash. Rev. Code, § 2.64.020.) The commission contends that The Recorder's survey of the law of these 10 states constitutes a tacit concession that the "overwhelming majority of states have a

In criminal proceedings, whether in the trial court or in the Court of Appeal, California judges always make their decisions and "cast their votes" publicly, with no mask of anonymity.[16] Even jurors, after rendering a verdict, are regularly required to confirm—individually and in open court—that they have indeed voted in support of the verdict. (Pen. Code, § 1163.)[17] We note, however, that the commission is less like a trial court, and more

different procedure," and that "other states whose judicial discipline bodies, like the commission here, do not make a disclosure" of individual votes. (Emphasis in original.) However, the commission provides us with citations regarding only *three* such states—Connecticut, Mississippi, and Missouri. (See *In re Honorable Bruce L. Levin* (Conn. Jud. Review Council, Sept. 21, 1995) 1995 WL 908006; Rules Miss. Com. Jud. Performance, rule 8F, G; Mo. Com. Retirement, Removal and Discipline, Internal Proc. art. VIII.) The foregoing does not conclusively prove the merit of either the commission's or The Recorder's interpretation of section 18(j). It does, however, undercut the commission's argument that disclosing the votes of individual commissioners gravely jeopardizes the integrity of proceedings for judicial discipline. In any event, we need not rely on the laws of other states because we believe the voters of California have spoken quite clearly by approving a measure designed to "eliminate secrecy" in proceedings for judicial discipline.

[16]During the trial court hearing on The Recorder's petition, the commission suggested that the Court of Appeal sometimes issues anonymous decisions by designating an opinion as authored "By the Court." This is simply incorrect. California Rules of Court, rule 23.5 requires attribution of the votes of individual justices on a panel deciding a case in the California Courts of Appeal. That rule provides: "The opinion of a Court of Appeal shall identify the judges participating in the decision, including the author of the majority opinion and of any concurring or dissenting opinion, or the three judges participating when the opinion is designated " 'by the court.' " (*Ibid.*) Thus, although the *author* of a "by the court" opinion may remain anonymous, it is *always* clear that the author (whoever he or she may be) and both of the other named justices all concurred in—i.e., "voted" in agreement with—the opinion. Similarly, our Supreme Court occasionally issues opinions without designating the author, especially in attorney and judicial disciplinary matters. (See, e.g., *In re Wright* (1973) 10 Cal.3d 374 [110 Cal.Rptr. 348, 515 P.2d 292]; *Siegel* v. *Committee of Bar Examiners* (1973) 10 Cal.3d 156 [110 Cal.Rptr. 15, 514 P.2d 967]; *Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270 [110 Cal.Rptr. 201, 515 P.2d 1].) Indeed, some of the Supreme Court's "Per Curiam" or "By the Court" decisions have not been unanimous. (See e.g., *In re Michael L.* (1985) 39 Cal.3d 81 [216 Cal.Rptr. 140, 702 P.2d 222] [unsigned majority opinion, signed concurring and dissenting opinions by named justices]; *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158] [majority opinion unsigned; one opinion concurring and dissenting], overruled on other grounds by *Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85, 88 [44 Cal.Rptr.2d 420, 900 P.2d 669]; *Stanton* v. *Panish* (1980) 28 Cal.3d 107 [167 Cal.Rptr. 584, 615 P.2d 1372].) It is, nevertheless, always disclosed how each of the participating justices "voted" in each decision.

[17]Of course, there is no authority of which we are aware that a third party has the right to compel jurors to disclose how they voted in a criminal proceeding. By statute, California jurors may be so compelled at the behest of either the defense or the prosecution. (Pen. Code, § 1163.) This right is not one of state or federal constitutional dimension (*People* v. *Masajo* (1996) 41 Cal.App.4th 1335, 1340 [49 Cal.Rptr.2d 234]), and it will be deemed waived if the defendant fails to assert it at trial (*People* v. *Flynn* (1963) 217 Cal.App.2d 289, 294 [31 Cal.Rptr. 651]). However, it is our experience that it is extremely rare—at least in felony prosecutions—for a defendant to fail to request polling and it is, thus, understandable that the occasion for third party intervention rarely, if ever, arises.

closely analogous to an intermediate appellate court such as the Court of Appeal, insofar as it "reviews" decisions of the special masters (Rules Com. Jud. Performance, rules 129-135)[18] subject to further discretionary "review" in the Supreme Court. (See § 18(d); Cal. Rules of Court, rule 935.)

Even more closely analogous to the commission, however, is the State Bar Court.[19] Under Business and Professions Code section 6086.1 and rule 20 of the Rules of Procedure of the State Bar, formal attorney disciplinary proceedings (with certain exceptions) are held in public. Public hearings and trials are conducted before hearing judges (see Rules Proc. of State Bar, rules 2.58, 3.16, 20, 23), with review afforded in the Review Department of the State Bar Court (*id.*, rule 300 et seq.). Decisions of the Review Department—the counterpart of the commission—always identify the participating judges, including the author of the majority opinion and of any concurring or dissenting opinion. (See, e.g., *In the Matter of Hindin* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 657; *In the Matter of Jennings* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 337.) Thus, it is always disclosed how each of the participating State Bar Court judges "voted" in each case.

Like the votes of the judges of this court in criminal cases, or those of State Bar Court judges in attorney discipline cases, the commissioners' votes are the object and culmination of formal disciplinary proceedings against a

---

We also note the recent enactment of provisions requiring the trial courts to seal identifying information about trial jurors and to maintain the confidentiality of same absent further order of the court. (Code Civ. Proc., § 237; and Cal. Rules of Court, rule 33.6; see also *People* v. *Goodwin* (1997) 59 Cal.App.4th 1084, 1088 [69 Cal.Rptr.2d 576].) However important and effective these new laws may be in protecting the privacy and safety of citizen jurors, they do not apply to publicly appointed members of the commission. Moreover, to the extent there is a "jury" in formal proceedings for judicial discipline in California, that factfinding role is played primarily by the special masters, not commissioners. (See Rules Com. Jud. Performance, rules 121-129.) As the commission itself contends, the "ultimate" responsibility for judicial discipline rests with the commissioners, subject only to review by the Supreme Court when discipline is imposed. Thus, the role of the commissioners is more akin to that played by trial and intermediate appellate court judges in criminal proceedings.

[18]The special masters' decision is rendered in a "final report," which must contain "findings of fact and conclusions of law, along with an analysis of the evidence and reasons for the findings and conclusions, but shall not contain a recommendation as to discipline." (Rules Com. Jud. Performance, rule 129(d).) The respondent judge and/or the examiner may file with the commission a brief containing specific objections to the special masters' report, followed by response and reply briefs, and an opportunity to be heard orally before the commission. (*Id.,* rules 130, 132.) The commission may order the taking of additional evidence. (*Id.,* rule 133; cf. Code Civ. Proc., § 909 [Court of Appeal may take additional evidence on appeal and make additional findings of fact]; Cal. Rules of Court, rules 23 & 41 [procedures for same].) After a "determination" of the commission to impose discipline, the judge may seek review in the Supreme Court. (§ 18(d); Cal. Rules of Court, rule 935.)

[19]Unlike the commission, which originates in the state Constitution (§§ 8, 18), however, the State Bar Court is a creature of statute (see Bus. & Prof. Code, § 6086.5).

judge. They are essential to a valid exercise of the commission's authority, which requires the concurrence of a majority of its members. (Gov. Code, § 68704; Rules Com. Jud. Perf., rule 134.) The commission's final vote represents its " '. . . formal expression of a will, preference, wish or choice . . .' " with respect to imposition of judicial discipline. (See *California School Employees Assn.* v. *King City Union Elementary School* (1981) 116 Cal.App.3d 695, 702 [172 Cal.Rptr. 368].) Indeed, in all these respects, the vote of the membership is *the* most critical step in the commission's proceedings.

Given the broad mandatory language of Proposition 190, the clearly expressed intent of its proponents to eliminate secrecy in formal proceedings for judicial discipline, and the "legislative history" describing the adjudicative model the proponents were seeking to establish, it quite simply defies common sense to suggest that the votes of individual commissioners are not part of the "proceedings" that must, under the express terms of section 18(j), be "open to the public." Accordingly, we conclude that the commission's interpretation of section 18(j) is neither faithful to the language of the constitutional provision, nor " 'reasonable, fair and harmonious with its manifest purpose' " (see *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157]), and must be rejected.[20]

---

[20]For the first time at oral argument, the commission made an argument based on former rule 902 of the California Rules of Court, which provided, in relevant part: "Except as provided in this rule, *all papers filed with and proceedings before* the Commission . . . shall be confidential until a record is filed by the Commission in the Supreme Court." (*Id.*, subd. (a), italics added.) Former rule 902 was first adopted in 1966 (see *Mosk* v. *Superior Court, supra,* 25 Cal.3d at p. 498) and remained in effect until it was repealed in 1996 in response to passage of Proposition 190. Noting that the commission's consistent practice throughout that period was to disclose only numerical vote totals and not to reveal how individual commissioners voted in disciplinary "proceedings," counsel for the commission contended that, by drafting Proposition 190 to include language similar to that of former rule 902, the Legislature must be deemed to have understood the term "proceedings" to exclude the commissioners' voting practices. The commission has waived this argument by failing to raise it in its opening or reply briefs. (*Stevenson* v. *Baum* (1998) 65 Cal.App.4th 159, 167 [75 Cal.Rptr.2d 904]; *Chatterjee* v. *Kizer* (1991) 231 Cal.App.3d 1348, 1366, fn. 4 [283 Cal.Rptr. 60].) Even assuming it was not waived, however, we do not find this argument particularly enlightening. Whatever the meaning of the term "proceedings" in 1966 when the commission had no authority to hold public investigations or hearings (see *Mosk* v. *Superior Court, supra,* 25 Cal.3d at pp. 499-500), and even as late as 1994 when the commission was authorized to conduct public "hearings" in limited circumstances (see *Adams* v. *Commission on Judicial Performance, supra,* 8 Cal.4th at p. 647), the presumption of confidentiality that previously attached to all commission "proceedings" and "hearings" has now been reversed for "all . . . proceedings" in cases of formal discipline (§ 18(j)). As we have discussed, the drafters of Proposition 190 and the voters who approved it clearly expressed their intent to "eliminate secrecy" in our system of formal judicial discipline and to open all formal disciplinary

### 3. Interpreting the Term "Proceedings" in Section 18(j) to Require Disclosure of the Votes of Individual Members Will Not Produce "Harmful" or "Absurd" Consequences.

The commission issues dire warnings about the dangers of requiring public disclosure of the individual commissioners' votes, contending that *only* its interpretation of section 18(j) can ensure integrity in judicial disciplinary proceedings. It claims it must be allowed to continue its "long-standing historical practice" of secret voting because, otherwise, commissioners will be subject to political pressure and (especially with respect to the attorney members) retaliation by the judges who have been or may be called to appear before it. We will not dignify the latter suggestion with any extended discussion. As to political pressure, however, we fail to see how allowing the commissioners to act anonymously promotes, much less guarantees, integrity in the process. On the contrary, if the public is not allowed to see how the individual appointees are dispensing judicial discipline, it will be unable to determine what, if any, political pressure might be at work, or the sources of that pressure. Moreover, while the voters do not have direct control over who serves on the commission, they expressly reserved to themselves a fair measure of indirect control over commission membership insofar as a majority of the commissioners are now appointed by elected officials who must answer to the voters for, inter alia, their appointments to the commission and the conduct of their appointees.[21] Denying public access to full information about the commission's disciplinary decisions deprives the voters of an "ability to understand how the system operates and, in turn, its ability [to] make informed decisions regarding the need for positive changes to the system . . . ." (*San Bernardino County Dept. of Public Social Services* v. *Superior Court* (1991) 232 Cal.App.3d 188, 203 [283 Cal.Rptr. 332].)

The commission further suggests that the voters acted to open up formal disciplinary proceedings *only* because they were concerned with California judges' domination of their own disciplinary apparatus. The proponents of Proposition 190 did, of course, state that a chief purpose of the measure was to "eliminate judicial domination of the commission in favor of a public majority," and that "A PUBLIC MAJORITY WILL ENSURE A FAIR AND FIRM SYSTEM OF JUDICIAL DISCIPLINE." (Ballot Pamp., argument in favor of Prop.

---

proceedings to the public as the California courts do in criminal cases and the State Bar Court does in attorney discipline proceedings. It is, thus, immaterial that the commission has in the past narrowly construed its obligations to open its proceedings to public view.

[21]As The Recorder points out, without identifying how individual commissioners vote, it is impossible to know whether they are even showing up for work or whether members have (or should have) disqualified themselves for some reason. The vote tally in the Velasquez matter, and the change therein, suggests both problems, but there is no way to clarify what happened.

190 as presented to the voters, *supra*, at p. 12, upper case in original.) Obviously, however, they accomplished that objective by amending section 8(a), not section 18(j). Indeed, had elimination of judicial domination been the proponents' only objective, they could have cured that problem by changing the composition of the panel—to provide a majority of public members—without dispensing with the absolute "confidentiality" of all "proceedings" discussed in *Mosk* v. *Superior Court, supra,* 25 Cal.3d 474, or the more limited "confidentiality" for "hearings" at issue in *Adams* v. *Commission on Judicial Performance, supra,* 8 Cal.4th 630.

The commission has also claimed it will be difficult to find citizens willing to serve if prospective commissioners know their votes will be publicly disclosed. This is, however, a bald claim without support in the record. In any event, we fail to see the merit of a system in which public officials, sitting in judgment of other public officials regarding charges of official misconduct, are allowed to hide behind a veil of secrecy when making the "tough calls" necessary to any adjudicatory regime. A certain amount of courage and a "thick skin" are essential attributes for anyone who purports to perform "judicial" functions. We should expect, and accept, no less from members of the commission. (Cf. *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 273 [84 S.Ct. 710, 722, 11 L.Ed.2d 686, 95 A.L.R.2d 1412] ["If judges are to be treated as 'men [and women] of fortitude, able to thrive in a hardy climate,' . . . surely the same must be true of other government officials, such as elected city commissioners."].)

Finally, the commission contends that interpreting the term "proceedings" in section 18(j) to require disclosure of the votes of individual members leads inexorably to the "absurd result" that its "deliberations" (and even those of the Supreme Court upon review of commission decisions) must also be conducted in public. The commission reasons that deliberations and voting are "dual components of the collective decision-making process" (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 47 [69 Cal.Rptr. 480]), and that, if we hold that voting is part of the formal "proceedings" of the commission, there is no way to draw a line to shield its deliberations from public disclosure. The commission warns that The Recorder is, thus, seeking to "intrude into the judge's chamber and witness the deliberations of the justices," to observe "the deliberations and votes of the jury," and to " 'sit at the table' during the [c]ommission's deliberations."

The commission's argument on this point is vastly overstated. Indeed, we agree with the commission that it would be "absurd" to interpret the term "proceedings," as used in section 18(j), to include its deliberations. Unlike

the commission, however, we believe there is a principled way to define those "proceedings" that must be held "open to the public" to include the vote of the commissioners, but to exclude the deliberative process that produces those votes.

The argument that the term "proceedings" includes the "deliberations" of the commission is easily dispatched by reference to the "natural and ordinary meaning" (*In re Quinn, supra,* 35 Cal.App.3d at p. 482) of the term "proceedings" as generally understood when section 18(j) was enacted, and as intended by the proponents of Proposition 190. At the risk of sounding repetitious, the point is that when the commission acts in an adjudicatory capacity—as it does when it conducts "formal proceedings" for judicial discipline—the proponents of Proposition 190 intended the commission to conduct its formal "proceedings" as a court does in a criminal case and as the State Bar Court does in attorney discipline cases. It was and is widely understood that internal "deliberations" of American and California courts are, and always have been, conducted in secrecy and that the "judicial thought process" need not be disclosed to the public. Likewise, the *deliberations* of the judges of the State Bar Court are excluded from the provision requiring all State Bar Court proceedings to be public. (Rules Proc. of State Bar, rule 24.)[22]

There are, of course, good and sufficient reasons for secret deliberations in each of these settings.[23] As Professor Laurence Tribe has observed, protecting the confidentiality of "judicial" deliberations is "vitally needed to

---

[22]Similarly, although state administrative agencies subject to the Administrative Procedure Act are required to conduct their "adjudicative proceedings" openly (Gov. Code, §§ 11120, 11425.10, subd. (a)(3), 11425.20, 54950), the agency may conduct its deliberations in private (*id.,* § 11126, subd. (c)(3); and see Cal. Law. Revision Com. com., 32C West's Ann. Gov. Code, § 11425.20 (1998 pocket supp.) p. 94). Of course, thereafter, the agency's decision must be filed as a public record (Gov. Code, § 11517, subd. (e)), and must contain a written statement of the factual and legal basis for the decision (Cal. Law Revision Com. com., 32C West's Ann., Gov. Code, §§ 11425.10, subd. (a)(6), 11425.50, subd. (a)). One commentator has noted that the "vote" of the agency is not generally included in the decision because there is no specific statutory provision requiring such disclosure. (Cal. Administrative Hearing Practice (Cont.Ed.Bar 1997) § 8.31, p. 384.) However, a quick survey of case reporters from state administrative agencies reveals that many—including the Public Employment Relations Board, the Workers' Compensation Appeals Board, and the Public Utilities Commission—do, in adjudicatory matters, identify the participating commissioners, and identify the author of the panel's opinion and any dissenting, concurring, or nonparticipating members.

[23]As we have noted, we express no opinion about the scope of the term "papers," as used in section 18(j). We note, however, that it is a fairly simple matter to draw a line between "deliberative" written work product of a court or other adjudicatory body (draft decisions, memoranda, notes, or other critical analyses exchanged between and among adjudicators for the purpose of reaching a decision), and the opinion filed in a given case. Only the latter "speaks for" and constitutes the official "action" of the adjudicatory body. (*Copley Press, Inc.* v. *Superior Court* (1992) 6 Cal.App.4th 106, 114 [7 Cal.Rptr.2d 841].)

encourage collegiality, candor, and courage—both political and intellectual—protection needed not for the benefit of judges but for the benefit of society as a whole." (Tribe, *Trying California's Judges on Television: Open Government or Judicial Intimidation?* (1979) 65 A.B.A. J. 1175, 1179.) Similarly, California courts have recognized the critical importance of allowing state administrative agencies, when acting in an adjudicative capacity, "to review the evidence before it, to exchange views and to deliberate thereon under conditions conducive to calm, orderly and frank discussion." (*California State Employees' Assn.* v. *State Personnel Bd.* (1973) 31 Cal.App.3d 1009, 1011-1013 [108 Cal.Rptr. 57].) We agree with the commission when it claims the same values are at stake when it deliberates to evaluate the evidence and legal arguments in a formal, adjudicatory proceeding for judicial discipline.[24]

In sum, then, we conclude the vote of the individual members is an integral part of the "proceedings" of the commission that must be "open to the public" in any case in which the commission determines to initiate formal disciplinary proceedings against a California judge. (§ 18(j).) Thus, the commission had no discretion to withhold from "the public" information about how the individual commissioners voted, and the trial court did not err by issuing a writ of mandamus to compel its release.[25]

---

[24]The commission's reliance on "open meeting" cases such as *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs., supra,* 263 Cal.App.2d 41, is misguided. "[T]he term 'meeting,' as used in the Brown Act ([Gov. Code,] §§ 54950, 54953), is not limited to gatherings at which action is taken by the relevant legislative body; 'deliberative· gatherings' are included as well. [Citation.] Deliberation in this context connotes not only collective decisionmaking, but also 'the collective acquisition and exchange of facts preliminary to the ultimate decision.' [Citations.]" (*Frazer* v. *Dixon Unified School Dist.* (1993) 18 Cal.App.4th 781, 794 [22 Cal.Rptr.2d 641]; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs., supra,* 263 Cal.App.2d at p. 48.) However, the commission is expressly exempt from the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.), and that just drives home the point that the constitutional amendments enacted by Proposition 190 might have been— but were not—cast as "open *meeting*" laws. By requiring only the formal "proceedings" of the commission to be "open to the public," the Legislature and the voters undoubtedly understood they were dealing with an adjudicatory system—an apparatus for "judging" the judges of California—and not with an ordinary state or local administrative agency that conducts "meetings" to perform a variety of "legislative" *and* "judicial" or "quasi-judicial" functions.

[25]The commission appears to object to issuance of mandamus on the ground that the courts are thereby requiring it to account for the individual votes in the Velasquez matter and create a record of individual votes in future cases. The commission suggests it has discretion with respect to the creation and maintenance of such information. This objection rings hollow because the commission has imposed upon itself a *mandatory* duty to "maintain records of all *actions taken* by the commission concerning a judge." (Rules Com. Jud. Performance, rule 135.)

III.  DISCUSSION—APPEAL No. A080466*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

IV.  CONCLUSION

For all the foregoing reasons the judgment of the trial court, including the order granting The Recorder's motion for attorney fees, is affirmed. The Recorder shall recover its costs on appeal, including reasonable attorney fees in an amount to be determined by the trial court on remand. (*Schmid* v. *Lovette* (1984) 154 Cal.App.3d 466, 480 [201 Cal.Rptr. 424].)

Corrigan, Acting P. J., and Walker, J., concurred.

---

*See footnote, *ante*, page 258.